The floor is yours, Mr. Dekker. I'm going to ask Michelle the proper test to use, I would argue, and whether or not there was a fact issue that remained. Neither side truly agrees on the proper standard. We do agree with the court in that we do believe that it's intermediate scrutiny. We don't believe that the burden was met. We do understand that appellees believe that there should have been, CAR should have been used in its rational basis theory. However, we argue that even if you're looking at rational basis, it can't be arbitrary. And that's the only type of evidence that they did have in their studies, et cetera. So we don't believe that they even met that burden if this court decides that it's a rational basis. We believe that the way a case is played is important and that will guide justice ability and issues. We believe this is a Craig v. Bourne case because the rule hinges on gender alone. And Craig v. Bourne came after CAR and said anytime we're speaking of gender, it's going to be an intermediate scrutiny. That's applied. This is not a hair case in that instance. We believe that because we don't want to get off in the argument as to whether or not hair is a fundamental right, et cetera, which people use when they raise CAR, because this is a gender specific grooming code. If this was a universal rule, because I want to back up and say I believe that appellees are arguing that we want CAR overturned and that's not what we want. We believe the two can coexist and they must coexist. We believe that CAR is utilized if there's no gender based distinction in the rule or policy or procedure. And that Craig v. Bourne is utilized if there is. On the face of the rule, it's facially attached to gender and sex. So because of that, that puts us in Craig v. Bourne land. We're out of CAR land. We essentially, just to backtrack on our original claims, brought a Crown Act claim, which we believe makes our case a little different than others, because we have a state claim where we believe the hairstyle was protected and then through race, the particular style. The court threw out the Crown Act case because the argument was, well, on its face, it doesn't seem racially discriminatory, it doesn't attack race. The grooming code and the rule itself, therefore, Crown Act doesn't apply. Racial discrimination doesn't apply. Argument we made was, well, we've argued direct discrimination and we've also argued to spare impact discrimination, which it's too early to make that ruling because we haven't had a chance to even develop that case. But we believe that the Brown test was applied because had the Crown Act been there, it would have been an even heightened burden. However, dealing with what's before us, we still don't believe that they met either burden on a rational basis or intermediate scrutiny. And what do you do with the superintendent's affidavit regarding the importance of career readiness as it applies to a school policy such as this? Problem is those affidavits, and in all the other cases that we've seen that discuss car, Judge Smith, there's no distinction made. In this particular case, it would be different because they have conflicting testimony, is our argument. In every other case, when we look at the evidence, to the best of my knowledge, the affidavits are spot on, sir, just as in this case, yes, sir. However, we have additional evidence in through testimony and deposition, sir, that go and controvert the statements that are made in the affidavits and also controvert these studies. Is there evidence that controverts the proposition that the superintendent spoke to, which is that career readiness is a legitimate governmental interest for a school district to pursue or promote? Yes, but in my opinion, it's missing. We go above and beneath because we have a gender-based distinction here. Okay, so I guess you used the word yes, but I think what you meant was no, there's no contradictory evidence to that. You're correct, sir. Because in this particular case, we have a gender-based distinction, so we need to line everything up with the gender-based distinction that's made in the rule. If we did not have the gender-based distinction, then it would not matter. But none of the studies that we have discuss anything gender-based. They're all very arbitrary. And the reason we cite to many of the school officials is that time and time again, they state that this is tradition. And that is why the grooming code is the way that it is. If that's true, you take the merit, you pull the carpet out from underneath the studies that you did because you say your grooming code haven't changed in such a long time, the studies are recent. Can you compare the evidence in this case proffered by the school district with that found insufficient by the Supreme Court in United States versus Virginia? Exceedingly persuasive justification. They don't need that. Because number one, again, all studies are, in our opinion, reactionary and they're responsive in nature. They're biased because they're written by internal individuals. They're just making statements. And that would work. As Judge Martin brought up, the affidavits. Generally, that would work. Problem is, we have deposition testimony that came in after that that controverted that. Did you point the court to that deposition testimony? The court seemed to express frustration with the inability to find the evidence that you contended created a fact issue. Yes. And originally, no, because we had the citations transposed, but the court gave us a chance to show the court and we did in that response. I want to say it's in the 4500s of the ROA. And it's entitled Our Response. And it responds directly to it. And at that point, we show the court exactly where in those depositions the testimony controversed the studies and the prior affidavit testimony. Was that before or after the court had reconsidered and granted the summary judgment? This was, and it happened, I'm trying to remember, but, Your Honor, I believe this was at the time in which they were getting ready to take up the matter of sanctions and we were issued the show cause originally. So after the court had ruled on the summary judgment motion? After the court had ruled on the first summary judgment motion, but I believe before the court ruled on the second. Summary judgment motion. In other words, did you fix the citations to avoid sanctions or before the court had a chance to rule on the motion for reconsideration? We fixed them before the court had a chance to rule on the motion for reconsideration. I mean, I'm sorry, after the court had a chance to rule on the motion for reconsideration. So it was after that, Your Honor. Okay. So after the court's ruling, but before the sanctions ruling? Yes, ma'am, Your Honor. Okay. However, the issue that I have with that is that the court says it's not going to look at our evidence, but the court clearly looked at our evidence. Because if you tell me, okay, you put a paraphrase with quotes, so then you looked at my evidence. True, but looking at your evidence to see if it says what you say it says and not finding it are two different things, wouldn't you agree? I mean, if you cite the court to a specific page of the record and say, this is where the deposition testimony contradicts the district's testimony and the court looks at that page and that page doesn't address it or doesn't exist. The court's looked at your evidence, but it hadn't found the evidence that you wanted it to look at. Argumentatively, yes, Judge. However, I believe the court made factual determinations of our evidence, but then said that it did not. Because how can you come to the conclusion that what I say is not in line with the evidence itself, so you haven't looked at it? Because I think there were two different ways. The way that Your Honor just described, but also I believe he attacked it factually. At the point in which you attack it factually and you've reviewed it, you have to in order to arrive to that conclusion, I would argue. What part of the district court's order attacked it factually? There is, and let me see where he discusses, because I think he says like utter falsities or uses the word false in the order as it relates to, I believe, some of the quotes of the school officials, Your Honor. It's a derivative of the word false. False is in the word, Your Honor. And so at that point, you're looking at it substantively. How is it substantively if you're looking at it to use your word? To use your description, but if the court looks at the page you asked it to look at and it doesn't say what you say it says, how is that an attack on your evidence? It's just saying this isn't what you told me it was. I believe the court addresses that, and I say that because of the court's response to our response when the court imposed the sanctions because the court went into the fact that they didn't think it was willful or malicious, and he states why. He did not, and I believe he kind of discusses the facts at that point as well. That's where I get that from, Your Honor. Can we talk about your position that the district has not met its burden under intermediate scrutiny or rational basis? Your Honor, because if we just look at rational basis, everything is arbitrary. They state that it's supposed to reflect the community expectations, but they just had a discussion in a meeting with the community, and they don't necessarily, during the discussion, present it in an unbiased manner. It's kind of just like, is this grooming code good? Do you all like it? To me, that's different than asking individuals what their beliefs are as it relates to girls' and boys' learning, different, and long hair affecting that learning, or women and men, jobs, and how long hair may affect it. They don't go into that. We believe that the way in which it's presented, it's arbitrary. Those are arbitrary studies, Your Honor, even when you say ensuring student success, because they just prop up the TEA percentages. Based on my knowledge, I don't even believe the TEA percentages discuss hair nor gender. That's arbitrary to me. Then when you advance the career readiness, there are thousands of jobs that people can have, and the only people that you discuss, the only jobs you discuss primarily were maybe like OSHA jobs, and they discuss military, but to me, that's a very small pool of the type of jobs, so I believe that that was arbitrary. And then there's no statistics, which statistics, you don't always have to make a school district have statistics just to meet immediate scrutiny. I understand that, but then there are no statistics as to how the children actually go into the workforce, so I just believe if you back into it, it doesn't fit. It's not substantially related. It's just a recitation. They just say it so and make it so. By saying they're a good school, and they are a good school, but there's nothing that shows us that it's because of the grooming code hair length for girls and boys, or that girls and boys learn differently due to hair length, or that all of the jobs that they could get possibly care about hair length at all. All right, thank you, Ms. Booker. Your time has expired, and Mr. Plummer has reserved time for rebuttal. Thank you. Thank you. Mr. Brush. Good morning, and may it please the Court. Jonathan Brush for the apologies, Barbers Hill Independent School District, Dr. Greg Poole, Lance Murphy, and Ryan Rodriguez. In my time before the Court, I intend to demonstrate that the district court correctly dismissed this case, and this Court should affirm, although the district maintains that the district court improperly held the district to a higher burden than this Court's precedent requires by requiring the district to meet the intermediate scrutiny standard. Regardless, however, the district easily clears the rational basis standard articulated in Carr v. Smith and meets the intermediate scrutiny standard. The appellant raises a host of procedural challenges to the district court's order, and unless there are specific questions about those challenges, I will defer to the briefing and move directly to the substance of the appellant's claims. And I'll start with the equal protection gender claim. This Court's en banc decision in Carr v. Smith should settle this case. The case was decided in 1972. While we recognize that precedes Craig v. Boren, where the Supreme Court recognized gender as a quasi-suspect class, even post-Craig v. Boren, this Court continued to apply Carr in the case of Dominica v. Rapides Parish. So this Court has continued to follow its own en banc precedent, as it must. Why does Carr control a facial sex classification challenge rather than a generic long hair challenge? It controls because this Court recognized in Carr that in the school context, and in constitutional litigation context is always informative and often dispositive, that the school districts, generally speaking, are entitled to great deference for setting the rules of conduct and the rules of grooming in schools. So even though there's a facial challenge to the district's dress and grooming code, this Court recognized that such claims simply are not cognizable and rational basis applies. It's the standard of scrutiny in such a claim, even if it's a facial challenge. And so there's no distinction in Carr that says, but if it's a facial challenge, then no. But there was no gender discrimination argument whatsoever in Carr. It was all about long hair among boys. Correct. Long hair among boys, but the implication being that the school district restricted the length of male students' hair in a way that, while Carr does not discuss this— Any kind of suspect criteria. And granted, at that point, the Supreme Court had not recognized gender as a suspect criteria. That first came in Craig v. Boren. But even post-Craig v. Boren, this Court has appropriately, under its rule of orderliness, followed Carr. So the implication in Carr is that if boys cannot have long hair because they're male students, the district imposed a short hair restriction on boys in Carr, the implication is that it was treating other students differently, female students. What evidence in the record justifies different hair length rules for girls and boys, as opposed to grooming standards generally? Correct. The evidence in our case. Yes. Yes. The most important evidence in the record start with, as Judge Smith asked, Dr. Poole's affidavit. Dr. Poole's testimony is uncontroverted. He offers three rationales, community expectations, student success, and career readiness. Each of those are legitimate, important governmental interests as a matter of law. This Court has so held in prior cases in Kennedy and Littlefield, both of which are discussed in our briefing. But specifically driving down onto the career readiness prong, Dr. Poole articulates that there are many employers that maintain short hair restrictions for male students in the Chambers County area, nationally, and including the United States military. And plaintiffs did not contradict Dr. Poole's testimony. There is no contrary evidence in the record, nor could they contradict Dr. Poole's testimony as it relates to the recognition that the military imposes differential grooming standards on men and women. Is that enough? Is it recognizing that there may be instances where different policies are appropriate is different from the school district showing that it needs to in this context, don't you  I think hypothetically it could be different, but here it is enough. And it's enough because the state of Texas charges local school districts with ensuring that their graduates are college, career, or military ready. That's a charge that the state of Texas imposes on its independent school districts. This Court's precedent and the U.S. Supreme Court precedent provide great deference to the means and methods by which school districts go about meeting those objectives and preparing children for the careers they may someday have. And so importantly, under this Court's precedent and the precedent in every other circuit, sex-differentiated grooming codes are permissible in the employment context. And so that's a reality that all students from the district may face. True, but it's up to the employers to set those. Why does the school need to do that? In other words, why set it for hair if we're looking at career or readiness for the military? Why not a physical fitness requirement? So there's a couple pieces to unpack there. So for instance, a physical fitness requirement. The state of Texas does have physical fitness requirements in its curriculum. What's more, there are some aspects of physical fitness standard that may implicate the anti-disability statutes. But school districts have the discretion to choose what policies to set. Notably, the male hair length restriction is part of a student code of conduct and a It's the only part that is specifically challenged in this case. So importantly, with respect to hair length restrictions and preparation for military, potential military service, as we point out in our briefing, unlike female students, all male students are required to register for the Selective Service on their 18th birthday. So there's a potential compulsion to serve. The Selective Service statute draws that distinction on who may serve. The Supreme Court has held that it did not violate the Equal Protection Clause for the Selective Service to have differential requirements. So that's a very specific career preparation component that male students may face. In the district's judgment, it is important to prepare its students for a wide range of careers that they may have and for a wide range of jobs that they may have. You're correct. It is up to an employer whether to set a hair length restriction. Not all employers do. But the key is that they have the authority to do so, and many do. And as Dr. Poole points out in his affidavit, particularly in the Chambers County area, many of the larger employers in the area do contain, do require, male, I'm sorry, impose male hair length restrictions. So there's both a discrete localized preparation in the community, as well as a broader preparation for any type of career. And so that, it is a sufficient basis. Now, I don't want to overlook student success and community expectations, each of which are also important governmental interests as a matter of law. The student success, and the council opposite acknowledged that the district's an excellent school district. It has very high TEA ratings. The district is charged with determining how best to be a successful district. There is no evidence that controverts Dr. Poole's testimony as it relates to student success. There is no evidence that contradicts the community expectations evidence that the district put forward. Each of those three important interests, again, qualifies as a matter of law. And the district's means of achieving those objectives relevant here, the male hair length restriction, substantially serves those goals. And there is enough of a fit between the policy, the goal, and the objective. Intermediate scrutiny doesn't require a perfect fit, nor does it require a specific quantum of evidence. There are no cases that council opposite has cited to the court that require specific quantums of evidence. And so here, the district has met the intermediate scrutiny standard as a matter of law, just as the school districts did in Kennedy and Littlefield. In each of those cases, the evidence that was provided were the affidavits of district officials and nothing more. At various points in the briefing, appellant challenges the district's evidence because it doesn't contain empirical studies. It doesn't have a sufficient and premature of expertise on it, essentially, is what they're arguing. There is no duty on a governmental body when setting policy to consult experts. There is no duty for the government to commission empirical studies. In fact, Justice Thomas and his concurrence in Scrimeti versus United States, and that's 605 U.S. 495, 526, warned against the dangers of expecting legislative bodies to be subordinate to expertise. There simply is no requirement for empirical studies when setting a school district policy. So the argument the appellant advances that there's some failing in the evidence because it is not expert evidence misses the mark and is contradicted by Craig versus Boren where the Supreme Court was dismissive of the need for statistical evidence in supporting a policy. How does the court determine whether the explanation is sufficiently persuasive? And two pieces. Are you asking about the important governmental interest or the second prong? The second prong. The second prong. I don't think it's been disputed that the three interests that were cited were important governmental interests. I think to the extent it's been disputed by appellants, it's been lightly disputed. But we certainly are of the view that there's no real dispute. With respect to how does a court determine whether or not the policy serves the important governmental interests, the court is going to look at the evidence that's proffered. And here, Judge Ramirez, your question about contrasting the evidence in this case with the evidence in United States versus Virginia is illuminating. In United States versus Virginia, Virginia's evidence was essentially that in order to have a culture of discipline and excellence and to provide unit cohesion in a military education, it had to be all male. Well, there was a significant problem with VMI's position. By the time that case was challenged, the United States Military Academy, Naval Academy, and Air Force Academy were all coeducational. And so if the United States Military Academies could train officers and give them a first-class military education, it revealed that Virginia's explanation rested on nothing more than archaic stereotypes. So here, and I sense a question. No, please finish. Here, the district is pointing to contemporarily existing conditions in the workplace. The state of the law is such that employers can have different dress and grooming codes based upon sex, as well as the uncontroversial fact that the military imposes differential requirements. Virginia said that what's required is exceedingly persuasive justification. How do we decide that? Whether the evidence that's here is sufficient. So the court has to look at the evidence and what is an exceedingly persuasive justification. Additional case law, like the INS versus Winn case that's cited in our briefing, makes clear that it doesn't require a perfect fit. So the exceedingly persuasive justification here is that the district is meeting its statutory obligation to prepare students for post-school careers. And they're doing it in a manner that is tied to a mandatory statutory directive that falls on all male students. And of course, male students who don't register for the selective service suffer penalties such as foregoing federal financial assistance. The district can tie its policy to goals that are exceedingly persuasive because Congress has set them. And the district is aiming to serve those goals with a policy that matches both the state of the law and the district's policy matches the state of the law by offering students potential preparation. How does the court assess exceedingly persuasive justification? In each case, the court is going to have to look at the evidence that's offered. The court should keep in mind that the Supreme Court and this court have cautioned courts not to second guess the justifications of educators and the decisions that are made by the educational bodies of this country in how to achieve their mission of educating children. Here, it's an easier call because the evidence simply isn't controverted. Appellant made no effort to controvert the evidence. Despite essentially dumping discovery into the record, they could not identify any contrary evidence. And there is no contrary evidence in the record. Does the district have to first meet its burden before we get to whether the plaintiff's identified evidence? So the district certainly has to meet its burden to articulate important governmental interests. And the district has to meet its burden to explain how its policy, the challenge policy, serves those governmental interests. Once the government has met that burden, and it is the government's burden to articulate both and to provide evidence to support, at that point it is absolutely the plaintiff's burden to provide controverting evidence, to try to create a fact question. And this court can see how that played out in Canady and Littlefield, which both applied intermediate scrutiny to school grooming codes. Now, in this circuit, there is little circuit precedent on this question because Carr has largely foreclosed this question in the Fifth Circuit for the past 50 or so years. And so we look to the intermediate scrutiny standard in those First Amendment cases. And there, this court acknowledged that the district's justifications in Canady and in Littlefield met intermediate scrutiny standard as a matter of law. So the court has no duty to look at the evidence. It could be an affidavit as simple as saying, I'm the school principal. I think these are appropriate grooming standards that further these three interests, in my opinion. And that's enough. No, I don't think a conclusory affidavit that said, in my opinion, essentially an Ipsy-Dixit affidavit gets you there. There has to be a tie between the interest and the policy that at least on its face, if there's no controverting evidence, at least on its face ties the two together, shows how the policy serves the governmental interest. Your brief pointed out, if I understand it, that the TEA applauded the district for its achievement in the quotation from your brief, preparing its students for success after high school, in college, the workforce, or the military. Correct, Your Honor. And that would be part of the TEA ratings. And that is additional evidence showing how the district's overall policies and practices serve those goals. How do you correlate hair length with those achievements, though? They can coexist without causation, can't they? I mean, it could be greater parental involvement. You've got a very active counsel here who's made these recommendations, who's looked at all of these policies at all the schools across Texas. But just because the two exist side by side doesn't necessarily mean that one causes the other. Well, correct. There are a great many variables, particularly with respect to student success, that can confound one another. Variables as simple as some children just have greater intellectual aptitude for school. Socioeconomics play a role. Individual characteristics play a role. But the district's policies in total, which includes the male hair length restriction, have been shown to be successful. And again, to draw to the career readiness prong, the district can articulate a direct tie, a direct tie between the male hair length restriction and rules and regulations that male students may well face in their future careers. Just briefly, I would like to touch upon the Crown Act claim, because counsel opposite did discuss the Crown Act and obliquely discussed the Title VI race discrimination claim. With respect to the Title VI race discrimination claim, the appellant failed to properly brief the dismissal, failed to grapple with the district court's analysis for why it was dismissing Title VI. That issue should be held to be forfeited, and we address it on the merits in the brief. With respect to the Crown Act claim, the Crown Act on its face applies to hairstyle. It does not apply to length. There is no factual dispute here that the district's policy allows students to wear protective hairstyles, including locks, twists, and braids. It merely circumscribes the length at which they can be worn. The court should decline to certify this question to the Texas Supreme Court. It's a simple question of statutory textual analysis. We start with the text, end with the text. The Crown Act doesn't apply to length. Ultimately, the district requests that this court acknowledge that CAR remains good law and is the controlling authority for these types of claims, and that rational basis should apply and that the district easily meets rational basis. If the court determines that intermediate scrutiny applies, the court should affirm the district court's decision as the district cleared each element as a matter of law. Or we could assume that intermediate scrutiny applies if we determine that the policy can be upheld under that standard. I'm sorry, Your Honor. I misheard you. We could assume intermediate scrutiny for purposes of argument if we decide that the policy meets the constitutional standards. Yes, Your Honor. The court could certainly do that. All right. Thank you, Mr. Brush. Mr. Palmer for rebuttal. Good morning, Your Honors. May it please the court. Today, we have presented evidence or presented an argument that has shown that the district has failed to meet the burden to prove why their hair length policy could stand up under I'm sorry, under intermediate scrutiny on a rational basis. They have been unable to draw a distinct line between their hair length policy and the policy of career readiness because if we're discussing what their findings say as far as career readiness of the military, why don't we institute uniforms for the boys to wear on campus? If we're going to institute career readiness as far as young men working at refineries that are known to be in the area, those men wear Nomex to work every day. Why not institute that into your policy? And so, I believe Judge Ramirez had a great question as to what specifically do you point to to say that the hair length policy is in direct correlation to the standards of this district and has improved this district. This district is known to have a larger tax base, more influx of funds for participation of students in this case. Also, you had Fred Skinner who helped vote on this policy say in his deposition on page 22 that he felt the sample size to represent the community involvement in this was rather small, a man that worked at NASA. I don't think that the policy or what the athletes used in their argument to draw a distinct line between hair length rule and what has happened in the district for career readiness, I don't think it's enough. I think it's arbitrary and it has not met the burden. And I think that this court should look into all the evidence that was presented when it makes this determination that anyone can write an affidavit and state what it is, but there has been no proof. Again, in Fred Skinner's deposition, he said the study they conducted had a small sample size on page 22 and it was done by a Barbers Hill teacher. So she has a dog in the fight of writing the report that she says justifies the district's policy. And so in this regard, again, this does not meet the United States versus Virginia test. That test is very clear and has been asked about several times. I think one of the main things in that is that it can't be based on tradition. It can't be based, excuse me, Your Honor. It can't be based on tradition. It can't be based on assumptions. It can't be based on stereotypes. It can't be based on administrative convenience and it can't be based on vague policy claims. We contend that this falls under vague policy claims. The sample size wasn't good enough. We have an affidavit. It has not been substantiated by any other direct correlation. So we feel that in this regard, they don't meet the exceedingly persuasive justification that the United States versus Virginia required them to meet. And so therefore, we feel that this policy is arbitrary and doesn't meet the intermediate scrutiny nor the rational basis standard. And then on the Crown Act, the district discusses that the Crown Act should not be discussed or should be considered. And it should because he states clearly in his argument just a few minutes ago that the contemporary workplace, what's moving forward. Obviously, the state of Texas thought that they needed to... What he said was that the Crown Act applies to style, not to length. Do you disagree with that statement? I totally disagree with that statement, Your Honor. What can you read us from the Crown Act where it applies to length? There's not a specific provision that says length, but there's a specific provision that says locks, braids, and other protected hairstyles. That's style, yeah. Right. But if we look at the nature of the style of locks, when have you ever seen someone with dreadlocks? Okay, are you asking us to hold as a matter of law that the Crown Act applies to length as well as to style? Yes, it does. Because of the type of styles that is, you can't have braids without having length. You can't have locks without having length. That's almost a given. My hair can't go in dreadlocks right now. I have short hair. I can't braid my hair. In order to do that, you have to have length. So we believe that that is something that maybe not specifically was discussed in the Crown Act, but was very well intended to be protected in the workplace was a person that has a hairstyle that requires length. Counsel, I want to ask you about the authorities in your brief. Okay. So opposing counsel points out on page 11 of their brief that there are multiple cases in your brief that are misquoted.  And in one of the cases, the quotation is perhaps close enough that it could reasonably have been a benign error. But in the others, the quotations appear to be entirely made up. And there are passages that appear in quotation marks that are attributed to judicial decisions. But I and my staff have been unable to locate those words in the cited cases. And when a brief places words in quotation marks and attributes them to a court, that is not characterization. And that is not advocacy. That is a representation to the court. So were those representations accurate? Your Honor, I am unsure of which citations that you're, what you're speaking of specifically. So I can't. It's on page 11 of opposing counsel's brief. They point to three cases, two from the Fifth Circuit, one from the Seventh Circuit. And they say, quote, the cases don't contain the quoted language, unquote. It's on page 11 of Apolli's brief. And I noted or noticed that, that appellant, your side, you didn't follow a reply brief. Is that correct? That's correct, Your Honor. So there, it's page 11 of Apolli's brief. So I just wonder if you stand by the accuracy of those quotations today. And I'd ask you what process you used to verify the accuracy of the quotations and the legal authorities before the brief was filed. Yes, Your Honor. I cannot pull up the Apolli's brief. I thought I had it on my computer. I do not. So I, again, I cannot answer. We'll be glad to supply you with a copy here if the bailiff can come up here. And I'll be glad to hand you a copy. And we'll stay here all afternoon if we have to until you've had an opportunity to answer Judge Willett's question. There we go. Take whatever time you need to look at the brief and answer Judge Willett's question. So, Your Honor, it appears that we paraphrase and these are not direct quotes. So you're saying you did not attribute any quoted language to those cases that are, in fact, inaccurate? I just want to say that they're paraphrasing that. They're not direct quotes. Were there any generative AI tools used to draft, summarize, or verify the authorities in your brief? Not, no, sir. These were all briefed during Westlaw and Lexis, access that we have. So until I mentioned it a few minutes ago with you at the podium, you were unaware that any quotation or citation in the brief might be inaccurate? I'm not sure of your question, Your Honor. He's asking you as an officer of the court what you knew about this and whether you were aware that opposing counsel had made this suggestion about these inaccuracies. Were you aware of that? I guess it's a more complex question. Were you aware of the inaccuracies when you helped prepare the brief, if you did? But secondly, as an officer of the court, tell us whether you were aware that these questions had been raised, or is Judge Wellett's question the first time you've ever heard of any kind of problem with your quotations? So I read, if I answer the first question correctly, I read the brief, their brief, and I did read about the non-existent quotations. We did not reply, we did not respond a reply brief to address that. No, we did not. On the second question of, I'm unsure, the same question of whether there was an issue with the citations, is this the first, I'm unsure of the question that you're asking, the second question. I'm trying to make sure I answer it properly. I mean, Judge Wellett can follow up with it. The nub of it is, are these questions I'm asking a surprise to you? Are they coming out of left field? Based on what they briefed, no, because what's in their brief, no, Your Honor. So you stand, as you're standing there today, you also stand by the accuracy of the quotations and the paraphrase? No, Your Honor, when I said that they weren't, I said they were paraphrased, they weren't accurate as far as the paraphrasing. That's what I said. I didn't say that. Are you contending that insofar as they were paraphrasing and not exact quotes, we'll get past the fact that you put them in quotes? Are you telling us as an officer of the court that you think the paraphrasing was accurate in terms of your representation to this court about what those authorities said? Yes, Your Honor, what we understood those authorities to say, yes, sir. And this case involves, you know, certainly serious issues, and we'll decide them according to what the law requires. But what should a court, what should this court do when a filed brief attributes either nonexistent or materially inaccurate language, when it attributes that language to a judicial decision? What should be our response? If I'm understanding the premise of your question correctly. I believe for the three cases or two cases that he cited in his page 11, that maybe the district court should disregard those cases and not include them in the substantive argument of what the brief has submitted for these three cases. So your suggestion is we just sort of, no harm, no foul, just kind of brush aside any argument connected to those authorities? Ms. Booker, do you want to come up and contribute? Yes. And so there shouldn't have been quotations because essentially they were theories and of those cases and what they meant. And so he stays on me, that's why it's like, oh, it's me. You know, he stays on me about making sure that each and every word, even if I argue the case in front of a judge, that I'm using the exact same verbatim language that's in the case. I normally just directly conclude and I kind of argue in it. And so that was the issue. It shouldn't have been quotes around it. Drawing a theory from a case and making an argument about what a case means is different than quoting the case particularly. And I understand that. I get it now. That is more my style than his stating and arguing the case. And so my argument is there. Okay. Mr. Plumbar, when I asked him if there were any generative AI tools used to draft or summarize or verify the authorities or the arguments in the brief, he said no. Is that your response to? Yes. And then if they were used, I'm not saying it's categorically bad to use them, if they were used, what independent verification did counsel use to perform before filing the brief? Can you ask me that one more time? I'm sorry. If such tools were used, then what independent verification did counsel, you two, or your staff use? What did you perform before filing the brief? We use lexics, nexics, and Westlaw. And so I don't know where it was in us bouncing it back and forth between those beneath us and ourselves. But I know that those are theories and those were my arguments about the case. And they should not have been enforced. I do know that. Let's just be sure that Mr. Plumbar has answered the question. Ms. Booker, were there any AI tools used in preparing your brief? No. There are times that I've used AI tools in looking at a case itself, but not in preparing a brief, because our brief is on, it hasn't been touched since 19, the case law is so old, and it's essentially a case of first precedent. So we wouldn't be able to utilize things to help us in that nature or regard. Because there's just nothing on the Crown Act. So standing here today, is there any correction or clarification or withdrawal that you want to make regarding your brief's representations of authority? Those are my arguments. There shouldn't be quotations around my arguments. If I believe that the gist of three cases means something, then it shouldn't have quotes around it because it's going to cause the clerks or yourselves to look for those exact words within the case and it's not there. And I do understand that now. All right, your case is under submission. All of today's case under submission and the court is in recess until nine o'clock tomorrow.